# EXHIBIT I

**EXECUTION COPY**

**AMENDED AND RESTATED OPERATING AGREEMENT**
**OF**
**819D LLC**

THIS AMENDED AND RESTATED OPERATING AGREEMENT OF 819D LLC (this "Agreement") is entered into and shall be effective as of February 5, 2016, by and between **TRG Development** LLC, a District of Columbia limited liability company (the "Manager") and the Persons identified as Class A or Class B Members on Exhibit A attached hereto (and such Persons shall be referred to herein as the "Members").

## RECITALS

WHEREAS, the Company was formed by filing a Certificate with the Department on November 12, 2013; and

WHEREAS, the Class B Members entered into an Operating Agreement dated as of June 24, 2014 to regulate the affairs of the Company (the "Original Operating Agreement"); and

WHEREAS, the Company has been engaged in redeveloping a church building located at 819 D St., N.E. in Washington, D.C. into a multifamily building (the "Project"); and

WHEREAS, the Class B Members have determined that the Project requires additional capital and alternate management in order to complete the Project; and

WHEREAS, the principals of the Manager have experience in redeveloping properties in the District of Columbia into multifamily condominium and rental properties; and

WHEREAS, the Class A Members are willing to commit up to $2.4 million as additional Capital Contributions, pursuant to the terms herein, to be used to complete the Project, in exchange for a Class A Membership Interest in the Company; and

WHEREAS, the Class B Members are willing to (i) admit the Class A Member as a Member of the Company, (ii) admit the Manager as a non-member manager of the Company and (iii) amend and restate the Original Operating Agreement to reflect, among other things, the Capital Contribution obligations of the Class A Member and the management authority of the Manager.

NOW THEREFORE, the parties hereto agree to completely amend and restate the Original Operating Agreement to read as follows, effective as of the Effective Date.

1

## SECTION 1
## THE COMPANY

1.1    <u>Formation</u>.  The Company was formed as a limited liability company under and pursuant to the provisions of the Act.  The fact that the Certificate is on file in the office of the Department shall constitute notice that the Company is a limited liability company.  The rights and liabilities of the Members shall be as provided under the Act, the Certificate and this Agreement.

1.2    <u>Name</u>.  The name of the Company shall be 819D LLC, and all business of the Company shall be conducted in such name.

1.3    <u>Purpose; Powers</u>.

(a)    The purpose of the Company is to engage, directly or indirectly, in any and all types of lawful business for which limited liability companies may be organized under the Act.

(b)    The Company has the power to do any and all acts necessary, appropriate, proper, advisable, incidental or convenient to or in furtherance of the purposes of the Company set forth in Section 1.3(a) hereof.

1.4    <u>Effective Date;</u>.  This Agreement shall become effective as of the Effective Date.

1.5    <u>Term</u>.  The Company shall have perpetual existence until it is dissolved and its affairs wound up in accordance with this Agreement and the Act.

1.6    <u>Filing of Articles</u>.  The Articles have been executed and filed with the Department in accordance with the Act.  The Manager is hereby authorized to take all other actions consistent with this Agreement that it determines is necessary or appropriate from time to time to comply with all applicable requirements for the formation, operation and, when appropriate, termination of the Company as a limited liability company under the Act.

1.7    <u>Registered Agent and Office</u>.  The Company's registered agent for service of process and registered office in the District of Columbia shall be that Person and location reflected in the Articles.  As provided in Section 9 hereof, the Manager may, from time to time, change the registered agent or office through appropriate filings with the Department.  If the registered agent ceases to act as such for any reason or the registered office shall change, the Manager shall promptly designate a replacement registered agent or file a notice of change of address, as the case may be.  If the Manager fails to designate a replacement registered agent or change of address of the registered office, the Class A Member may designate a replacement registered agent or file a notice of change of address.

1.8    <u>Principal Place of Business</u>.  The Company's principal place of business shall be 1928 37th St., N.W., Washington, D.C. 20007, c/o The Rubin Group.  The Manager may change the location of the Company's principal place of business from time to time.  The Manager shall make any filing and take any other action required by applicable law in connection with the

2

change and shall give notice to all Members of the new location of the Company's principal place of business promptly after the change becomes effective. The Manager may establish and maintain additional places of business for the Company.

      1.9   <u>Independent Activities; Transactions with Affiliates</u>.

      (a)   Insofar as permitted by applicable law, neither this Agreement nor any activity undertaken pursuant hereto shall prevent the Manager or its Affiliates or any Member or its Affiliates from engaging in whatever activities they choose, whether the same are competitive with the Company or otherwise, and any such activities may be undertaken without having or incurring any obligation to offer any interest in such activities to the Company or any Member, or require any Member to permit the Company, the Manager or its Affiliates or any Member or its Affiliates to participate in any such activities, and as a material part of the consideration for the execution of this Agreement by each Member, the Manager and each Member hereby waives, relinquishes, and renounces any such right or claim of participation.

      (b)   To the extent permitted by applicable law and subject to the provisions of this Agreement, the Company is hereby authorized to sell property to or otherwise deal with the Manager or any Member, acting on its own behalf, or any Affiliate of the Manager or any Member; provided that any such sale or other transaction shall be made on terms and conditions which are no less favorable to the Company than if the sale or other transaction had been made with an independent third party.

      1.10   <u>Definitions</u>.

      Unless otherwise defined herein, capitalized words and phrases used in this Agreement have the following meanings:

      "Act" means the Uniform Limited Liability Company Act of 2010 (Sections 29-801.01 et seq, of the District of Columbia Code), in its present form or as amended from time to time.

      "Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

      (i)   Credit to such Capital Account any amounts that such Member is deemed to be obligated to restore pursuant to the penultimate sentences in Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), and

      (ii)   Debit to such Capital Account the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6).

      The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"Affiliate" means, with respect to any Person (i) any Person directly or indirectly controlling, controlled by or under common control with such Person (ii) any officer, director, general Member, member or trustee of such Person or (iii) any Person who is an officer, director, general Member, member or trustee of any Person described in clauses (i) or (ii) of this sentence. For purposes of this definition, the terms "controlling," "controlled by" or "under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person or entity, whether through the ownership of voting securities, by contract or otherwise, or the power to elect at least 50% of the directors, managers, general partners, or persons exercising similar authority with respect to such Person or entities.

"Agreement" or "Operating Agreement" means this Amended and Restated Operating Agreement of 819D LLC including all Exhibits and Appendixes attached hereto, as amended from time to time. Words such as "herein," "hereinafter," "hereof," "hereto" and "hereunder" refer to this Agreement as a whole, unless the context otherwise requires.

"Articles" means the Articles of Organization of the Company, as properly adopted and amended from time to time by the Members and filed with the Department.

"Business Day" means a day of the year on which banks are not required or authorized to close in Washington, D.C.

"Capital Account" means, as to any Member, the Capital Contribution actually made by that Member, plus all Profit allocated to that Member, and minus the sum of (i) all Loss allocated to that Member, (ii) the amount of cash and the fair market value of any other assets distributed to that Member (net of liabilities, assumed or taken subject to by such Member), and (iii) such Member's distributive share of all other expenditures of the Company not deductible in computing its taxable income and not properly chargeable as additions to the basis of Company property. Each Member's Capital Account shall be determined and maintained in accordance with the Regulations adopted under Section 704(b) of the Code.

"Capital Contributions" means, with respect to any Member, the amount of money and the initial fair market value of any Property (other than money) contributed to the Company with respect to the Membership Interests in the Company held or purchased by such Member, including any additional capital contributions as set forth in Section 2.2 hereof.

"Certificate" means the Articles of Organization filed with the Department pursuant to the Act to form the Company, as originally executed and amended, modified, supplemented or restated from time to time, as the context requires.

"Class A Member" means **819 Capital LLC**, a District of Columbia limited liability company, and its permitted successors and assigns.

"Class A Membership Interest" means the Membership Interest granted to the Class A Member pursuant to this Agreement.

4

"Class B Member" means any Person identified as a Class B Member on Exhibit A attached hereto, and any permitted successor or assign. "Class B Members" means all of the Members identified as Class B Members on Exhibit A.

"Class B Membership Interest" means the Membership Interest granted to a Class B Member pursuant to this Agreement.

"Code" means the United States Internal Revenue Code of 1986, as amended from time to time.

"Company" means 819D LLC, the limited liability company formed pursuant to the Original Operating Agreement and the Certificate and the limited liability company continuing the business of this Company in the event of dissolution of the Company as herein provided.

"Company Minimum Gain" has the same meaning as the term "partnership minimum gain" in Regulations Sections 1.704-2(b)(2) and 1.704-2(d) .

"Department" means the District of Columbia Department of Consumer and Regulatory Affairs, or any successor agency.

"Depreciation" means, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such Fiscal Year, except that if the book value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount that bears the same ratio to such beginning book value as the federal income tax depreciation, amortization, or other cost recovery deduction allowable for such Fiscal Year bears to such beginning adjusted tax basis, provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning book value using any reasonable method selected by the Tax Matters Member.

"Dissolution Event" shall have the meaning set forth in Section 12.1 hereof.

"Effective Date" means February 5, 2016.

"Fiscal Year" means (i) each twelve-month period commencing on January 1, and ending on December 31, or (ii) any portion of the period described in clause (i) for which the Company is required to allocate Profits, Losses, and other items of Company income, gain, loss or deduction pursuant to Section 3 hereof.

"Forbearance Agreement" means that certain Forbearance, Consent and Modification Agreement dated this date, by and among the Company, the Class B Members and Monument Bank.

"Manager" means TRG Development LLC, a District of Columbia limited liability company, and its duly appointed successors.

5

"Member" (or collectively "Members') means any Person (i) who is referred to as such on Exhibit A to this Agreement, or who has become a substituted Member pursuant to the terms of this Agreement and (ii) who has not ceased to be a Member.

"Member Loan Interest Amount" shall have the meaning set forth in Section 2.3 herein.

"Member Nonrecourse Debt" has the same meaning as the term "partner nonrecourse debt" in Regulations Section 1.704-2(b)(4).

"Member Nonrecourse Debt Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Regulations Section 1.704-2(i)(3).

"Member Nonrecourse Deductions" has the same meaning as the term "partner nonrecourse deductions" in Regulations Sections 1.704-2(i)(1) and 1.704-2(i)(2).

"Membership Interest" means the entire Class A or Class B, as applicable, limited liability company interest of a Member in the Company at any particular time, including the right of such Member to distributions and allocations as a Class A or Class B Member, as applicable, and any and all other benefits to which a Member may be entitled to as provided in this Agreement and under law, together with the obligations of such Member to comply with all the terms and provisions set forth in this Agreement and in the Act.

"Net Cash Flow" for any date for which a determination thereof is required or desirable, means the sum of (i) all cash receipts received by the Company prior to such date, including payments to the Company constituting Capital Contributions and loans, and (ii) the total amount released from any reserves previously established that the Manager determines is no longer required to be held in reserve; and reduced by (i) all costs and expenses incurred or paid by the Company prior to such date, including loan repayments and distributions to Members, plus (ii) all additions to the Company's reserves, as determined by the Manager in its sole discretion.

"Net Member Loan Amount" shall mean, for any Member who makes a loan to the Company pursuant to Section 5.5(b), the amount of such loan reduced by the aggregate amount of distributions made to the Member pursuant to Section 4.1(j) prior to the time of determination of the amount to be distributed to such Member pursuant to Section 4.1(j).

"Nonrecourse Liability" shall have the meaning set forth in Regulations Section 1.704-2(b)(3).

"Officer" or "Officers" shall have the meaning set forth in Section 5.5 herein.

"Operating Member" shall have the meaning set forth in Section 5.7 herein.

"Percentage Interests" means, for each Member, such Member's share of distributions pursuant to Section 3.1(a)(ii) (regardless of whether or not a Member is entitled to such distribution at the time).

6

"Permitted Transfer" has the meaning set forth in Section 10.2 hereof.

"Person" means any individual, partnership (whether general or limited), limited liability company, corporation, trust, estate, association, nominee or other entity.

"Profits and Losses" means for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such Fiscal Year or other period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments (without duplication):

(i)     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be added to such taxable income or loss;

(ii)    Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses," shall be subtracted from such taxable income or loss;

(iii)   In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year, computed in accordance with the definition of Depreciation;

(iv)    To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) from the disposition of such asset and shall be taken into account for purposes of computing Profits or Losses; and

(v)     Notwithstanding any other provision of this definition, any items that are specially allocated pursuant to Section 3.2 or Section 3.3 hereof shall not be taken into account in computing Profits or Losses.

The amounts of the items of Company income, gain, loss, or deduction available to be specially allocated pursuant to Sections 3.2 and 3.3 hereof shall be determined by applying rules analogous to those set forth in subparagraphs (i) through (v) above.

"Property" means all the real property and the improvements thereon commonly identified as 819 D St., N.E. in Washington, D.C. and any personal property owned or acquired by the Company, including cash, and any improvements thereto, and shall include both tangible and intangible property.

"Regulations" means the Income Tax Regulations, including Temporary Regulations, promulgated under the Code, as such regulations are amended from time to time.

7

"Tax Matters Member" has the meaning set forth in Section 8.1 hereof.

"Transfer" means, as a noun, any voluntary or involuntary transfer, sale, pledge or hypothecation or other disposition and, as a verb, voluntarily or involuntarily to transfer, sell, pledge or hypothecate or otherwise dispose of.

SECTION 2
MEMBERS' CAPITAL CONTRIBUTIONS

2.1    Original Capital Contributions.  Each Class B Member shall be credited with the Capital Contributions made by such Class B Member, in the amounts set forth on Exhibit A.

2.2    Additional Capital Contributions.

(a)    The Class B Members acknowledge that the Class A Member will pay off that certain Deferred Purchase Money Promissory Note dated July 31, 2014 in the original principal amount of $1,400,000 (the "Purchase Money Note"), payable by the Company to The Way of the Cross Church of Christ, Inc. for $1,400,000.00, and that such amount shall be deemed to be an additional Capital Contribution that is credited to the Class A Member.

The Class B Members further acknowledge that the Class A Member has deposited $166,082.91 with Monument Bank in connection with the payment of real estate taxes due or to be due by the Company, and that such amount shall be deemed to be an additional Capital Contribution that is credited to the Class A Member.

(b)    The Class A Member acknowledges that the Class B Members and their affiliate, BHOB, LLC have paid certain amounts for the development of the Project and have paid certain additional amounts owed by the Company to its creditors in the amount of $1,441,528.52, and that such amount shall be deemed to be an additional Capital Contribution that is credited to the Class B Members.

(c)    To the extent that the amounts described in paragraphs (a) and (b) above are less than $200,000, the Class A Member will contribute the shortfall in cash as a Capital Contribution that is credited to the Class A Member.

(d)    The Class A Member will further contribute additional amounts to the capital of the Company, at such times and in such amounts as the Manager reasonably determines is necessary to fund the Company's obligations under the existing loan documents with Monument Bank (as such obligations  may be amended by the Forbearance Agreement) and such other Project or Company-related costs as the Manager determines, but in an aggregate amount (including all Capital Contributions made or deemed made pursuant to Sections 2.2(a), (b) and (d)) that is not less than $2,400,000. Such additional amounts shall be the Capital Contributions that are credited to the Class A Member, until such time as the aggregate amounts contributed (or deemed contributed) to the capital of the Company pursuant to Sections 2.2(a), (b), (d) and (e) equals $2,400,000.00 (at which time the Class A Member shall have no further obligation under this Section 2.2(e)).

8

(e)     Upon the Manager's determination that the Company should provide letters of credit or other collateral in order to satisfy any bonding obligations with respect to the Project and provided that there is no source of additional funding for the bonding obligations with respect to the Project as set forth in Section 2.3 hereof, the Manager shall notify the Members in writing of the amount of additional Capital Contributions needed to fund such bonds or similar obligations, and the Class A Member and the Class B Members, respectively, shall each be responsible for one-half of such amounts (with the amounts due from the Class B Members prorated in proportion to their respective Capital Contributions, as set forth on Exhibit A).  If the Class B Members do not contribute their full 50% share of the requested amounts within five (5) business days of their receipt of the written request therefore (which may be sent by email), the Class A Member may contribute the shortfall; and in such event the Class A Member will be credited with Capital Contributions equal to (i) the Class A Member's share of the requested amounts, plus (ii) two (2) times the shortfall amount contributed by the Class A Member.

2.3     Additional Funding Needs.  Upon the Manager's determination that the Company is in need of additional capital beyond the amounts committed in Sections 2.2(a) through (f) hereof, the Company shall seek such additional funds first by way of additional loans from the Members or Affiliates of the Members as set forth in Section 5.5(b) hereof.  In the event that such Member or Affiliate is not willing to make such additional loan to the Company, the Manager shall make application to Monument Bank for an increase in the amount of the current loan from Monument Bank to the Company (with the understanding that Monument Bank may accept, modify or reject the Company's request in its sole and complete discretion).

2.4     Members' Fees and Costs.  Any fees, costs or expenses incurred and paid by the Class A Members or the Class Members prior to the Effective Date of this Agreement that are not expressly addressed in this Section 2 shall be at the sole cost and expense of the respective Class A or Class B Member.

SECTION 3
ALLOCATIONS

3.1     Allocations of Profits and Losses.

(a)     Except as provided in Section 3.2 and Section 3.6, Profits of the Company for each Fiscal Year shall be allocated:

(i)     first, to the Members (pro rata based on the total amount required to be allocated to each Member pursuant to this Section 3.l(a)(i)), until the aggregate Profit allocated to each Member pursuant to this Section 3.l (a)(i) for such Fiscal Year and all previous  Fiscal Years after the effective date of this Agreement  is equal to the amount of Net Cash Flow distributed to such Members pursuant to Section 4.1 (f), (h), (j) and (k) hereof for such Fiscal Year and all previous  Fiscal Years after the effective date of this Agreement, as computed through the end of the Fiscal Year for which such allocation is made; and,

9

(ii)    thereafter, sixty percent (60%) to the Class A Member and forty percent (40%) to the Class B Members, pro rata in proportion to the Class B Members respective Capital Contributions.

(b)    Except as provided in Sections 3.2, Loss of the Company for each Fiscal Year shall be allocated first, to the Members in proportion to the Profits allocated to such Members for prior Fiscal Years, pro rata in proportion to the aggregate amount of the Members' allocated Profits (but in each case reduced by the Losses allocated to such Member pursuant to this Section 3.l(b)); and after the aggregate amount of the Company's Losses are equal to the aggregate amount of the Company's Profits for all prior Fiscal Years, any excess shall be allocated sixty percent (60%) to the Class A Member and forty percent (40%) to the Class B Members, pro rata in proportion to the Class B Members respective Capital Contributions.

3.2    <u>Special Allocation Rules</u>.  The following special allocations shall be made in the following order:

(a)    Minimum Gain Chargeback. Except as otherwise provided in Regulations Section 1.704-2(f) , notwithstanding any other provision of this Section 3, if there is a net decrease in Company Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Regulations Section 1.704-2(g) . Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2) . This Section 3.2(a) is intended to comply with the minimum gain chargeback requirement in Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(b)    Member Minimum Gain Chargeback. Except as otherwise provided in Regulations Section 1.704-2(i)(4) , notwithstanding any other provision of this Section 3, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Fiscal Year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(5) , shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(4) . Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2) . This Section 3.2(b) is intended to comply with the minimum gain chargeback requirement in Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)    Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(4) , Section 1.704-1(b)(2)(ii)(d)(5) , or Section 1.704-1(b)(2)(ii)(d)(6) , items of

10

Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of the Member as quickly as possible, provided that an allocation pursuant to this Section 3.2(c) shall be made only if and to the extent that the Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 3 have been tentatively made as if this Section 3.2(c) were not in the Agreement.

(d)    Gross Income Allocation. In the event any Member has a deficit Capital Account at the end of any Fiscal Year that is in excess of the sum of (i) the amount such Member is obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704 2(i)(5) , each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible; provided that an allocation pursuant to this Section 3.2(d) shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Section 3 have been made as if Section 3.2(c) and this Section 3.2(d) were not in the Agreement.

(e)    Nonrecourse Deductions. Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Members in proportion to their respective Percentage Interests.

(f)    Member Nonrecourse Deductions. Any Member Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i)(1).

(g)    Section 754 Adjustments. To the extent an adjustment to the adjusted tax basis of any Company asset, pursuant to Code Section 734(b) or Section 743(b) is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(2) or Section 1.704-1(b)(2)(iv)(m)(4) , to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of such Member's interest in the Company, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in accordance with their interests in the Company in the event Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Member to whom such distribution was made in the event Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

3.3    Curative Allocations. The allocations set forth in Sections 3.2(a)-(g) and 3.3 (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 3.4. Therefore, notwithstanding any other provision of this Section 3 (other than the Regulatory Allocations), the Tax Matters Member shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were

11

not part of the Agreement and all Company items were allocated pursuant to Sections 3.1, 3.2, and 3.3(h). In exercising its discretion under this Section 3.4, the Tax Matters Member shall take into account future Regulatory Allocations under Sections 3.3(a) and 3.3(b) that, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections 3.3(e) and 3.3(f).

3.4    Loss Limitation. Losses allocated pursuant to Section 3.1(b) hereof shall not exceed the maximum amount of Losses that can be allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Year. In the event some but not all of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses pursuant to Section 3.1(b) hereof, the limitation set forth in this Section 3.4 shall be applied on a Member by Member basis and Losses not allocable to any Member as a result of such limitation shall be allocated to the other Members in accordance with the positive balances in such Member's Capital Accounts so as to allocate the maximum permissible Losses to each Member under Regulations Section 1.704-1(b)(2)(ii)(d) .

3.5    Other Allocation Rules

(a)    For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Tax Matters Member using any permissible method under Code Section 706 and the Regulations thereunder.

(b)    The Members are aware of the income tax consequences of the allocations made by this Section 3 and hereby agree to be bound by the provisions of this Section 3 in reporting their shares of Company income and loss for income tax purposes.

(c)    Any "excess nonrecourse liability" of the Company, within the meaning of Regulations Section 1.752-3(a)(3) , shall be allocated first among the Members in proportion to and to the extent of the amount of built-in gain that is allocable to each Member on Code Section 704(c) property or property for which reverse Code Section 704(c) allocations are applicable where such property is subject to the nonrecourse liability to the extent that such built-in gain exceeds the gain described in Regulations Section 1.752-3(a)(2) with respect to such property. The amount of any excess nonrecourse liabilities not allocated pursuant to the preceding sentence shall be allocated in accordance with the Members' interests in Company profits. Solely for purposes of this Section 3.4(d), the Members' interests in Company Profits are in proportion to their Percentage Interests.

(d)    To the extent permitted by Regulations Section 1.704-2(h)(3) , the Manager shall endeavor to treat distributions of Net Cash Flow as having been made from the proceeds of a Nonrecourse Liability or a Member Nonrecourse Debt only to the extent that such distributions would cause or increase and Adjusted Capital Account Deficit for any Member.

3.6    Tax Allocations; Code Section 704(c). Except as otherwise provided in this Section 3.6, each item of income, gain, loss and deduction of the Company for federal income tax purposes shall be allocated among the Members in the same manner as such items are

12

allocated for book purposes under this Section 3. In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss, and deduction with respect to any Property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such Property to the Company for federal income tax purposes and its initial book value using the "traditional method" pursuant to the Regulations under Section 704(c).

Any elections or other decisions relating to such allocations shall be made by the Tax Matters Member in any manner that reasonably reflects the purpose and intention of this Agreement, provided that any items of loss or deduction attributable to property contributed by a Member shall, to the extent of an amount equal to the excess of (A) the federal income tax basis of such property at the time of its contribution over (B) the book value of such property at such time, be allocated in its entirety to such contributing Member and the tax basis of such property for purposes of computing the amounts of all items allocated to any other Member (including a transferee of the contributing Member) shall be equal to its book value upon its contribution to the Company. Allocations pursuant to this Section 3.6 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provision of this Agreement.

3.7     Depreciation Recapture. Pursuant to Regulations Section 1.1245-l(e), to the extent the Company recognizes gain as a result of a sale, exchange or other disposition of Company assets which is taxable as ordinary income under Code Section 1245 or Code Section 1250, such ordinary income shall be allocated among the Members in the same proportion as the depreciation giving rise to such ordinary income was allocable among the Members. In no event, however, shall any Member be allocated ordinary income hereunder in excess of the amount of gain allocated to the Member under this Agreement. Any ordinary income that is not allocated to a Member due to the gain limitation described in the previous sentence shall be allocated among those Members whose shares of total gain on the sale, exchange or other disposition of the property exceed their share of depreciation from the Company assets, in proportion to their relative shares of the total allocable gain.

3.8     Special Allocation of COD Income Upon Repayment of Purchase Money Note. Anything contained herein to the contrary notwithstanding, in the event and to the extent that any cancellation of debt income is recognized by the Company as a result of the repayment of the Purchase Money Note for an amount that is less than the outstanding balance thereof ("COD Income"), such COD Income shall be allocated entirely to the Class B Members in proportion to their respective Capital Contributions.

## SECTION 4
## DISTRIBUTIONS

4.1     Net Cash Flow.  Except as otherwise provided in Section 12.2 hereof, Net Cash Flow shall be distributed to the Members at such time or times and in such amounts as the Manager shall determine, but subject to the following order:

(a)    To payment of all third party costs with respect to the construction of the Project and, if applicable, the imposition of a condominium regime with respect to the Project;

(b)    To repayment of any and all indebtedness including loans from banks or other parties;

(c)    To fund a Letter of Credit or other collateral to satisfy any applicable condominium warranty requirements;

(d)    To satisfy or provide collateral for any bonds required by governmental agencies or utilities;

(e)    To the Class A Member, until the Class A Member's Capital Contributions credited to the Class A Member are reduced to zero;

(f)    To the Class A Member, an amount equal to sixty percent (60%) of the aggregate Capital Contributions previously credited to the Class A Member;

(g)    To the Class B Members, pro rata in proportion to their respective Capital Contributions, until such Class B Member's Capital Contributions credited to each Class B Member are reduced to zero;

(h)    To the Class A Member, an amount equal to forty percent (40%) of the aggregate Capital Contributions credited to the Class A Member;

(i)    To the Class A Member and the Class B Members, the accrued and unpaid Member Loan Interest Amount, pro rata in proportion to (but not in excess of) each Member's accrued and unpaid Member Loan Interest Amount;

(j)    To the Class A Member and the Class B Members, the Net Member Loan Amount, pro rata in proportion to (but not in excess of) each Member's Net Member Loan Amount; and

(k)    Thereafter, all subsequent distributions shall be made sixty percent (60%) to the Class A Member and forty percent (40%) to the Class B Members, pro rata in proportion to the Class B Members respective Capital Contributions.

4.2    <u>Amounts Withheld</u>.  All amounts withheld pursuant to the Code or any provision of any state, local or foreign tax law with respect to any payment, distribution or allocation to the Company or the Members shall be treated as amounts paid or distributed, as the case may be, to the Members with respect to which such amount was withheld pursuant to this Section 4.2 hereof for all purposes under this Agreement.  The Company is authorized to withhold from payments and distributions, or with respect to allocations to the Members, and to pay over to any federal, state and local government or any foreign government, any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state or local law or any foreign law, and shall allocate any such amounts to the Members with respect to which such amount was withheld.

14

4.3     Limitations on Distributions.

(a)     The Company shall make no distributions to the Members except (i) as provided in this Section 4 and Section 12 hereof, or (ii) as agreed to by all of the Members.

(b)     A Member may not receive a distribution from the Company to the extent that, after giving effect to the distribution, all liabilities of the Company, other than liabilities to Members on account of their Capital Contributions, would exceed the fair value of the Company's assets.

4.4     Tax Distributions.  If for any Fiscal Year a Member receives an allocation of Profit but does not receive a cash distribution equal to forty percent (40%) of the Profit (the "Gross Tax Distribution Amount") then notwithstanding anything in Section 4.1 to the contrary, such Member shall be entitled to receive in the next succeeding Fiscal Year or Years, prior to any further distributions provided for in Section 4.1, special distributions out of Net Cash Flow ("Tax Distributions") in an aggregate amount equal to the positive difference between (i) the Gross Tax Distribution Amount for such Member for such earlier Fiscal Year, over (ii) the aggregate distributions made to such Member for such earlier Fiscal Year (such difference, the "Tax Distribution Amount"). If there is more than one Member entitled to a Tax Distribution Amount for a prior Fiscal Year pursuant to this Section 4.4, the distributions under this Section 4.4 for such Prior Fiscal Year shall be made to such Members pro rata in proportion to their respective Tax Distribution Amounts for such prior Fiscal Year. Any amount distributed to a Member pursuant to this Section 4.4 shall, for purposes of this Section 4.4, not be treated as a distribution in an earlier Fiscal Year, and for purposes of Section 4.1, shall be treated as a credit against the distributions to which such Member is entitled pursuant to Section 4.1.  Example.  In 2016 and 2017, the Company has $200x in Profit and Net Cash Flow. In 2016, the Class A Member is allocated $120x of the Profit for 2016 and the Class B Members are allocated the remaining $80x of Profit. All $200 of Net Cash Flow is distributed to the Class A Member pursuant to Section 4.1(e). Since the Class A Member received distributions for 2016 ($200x) that were greater than 40% of the $120x of Profit allocated to the Class A Member, the Class A Member is not entitled to any Tax Distribution for 2016. Since the amounts distributed to the Class B Members for 2016 ($0) is less than 40% of the Profit allocated to the Class B Members for 2016 ($80x \times 40\% = 32x$), then the first distributions of Net Cash Flow for 2017 shall be made to the Class B Members, up to $32x; and such amounts shall be credited against distributions due to the Class B Members pursuant to Sections 4.1(g), (i), (j) and (k), as applicable.

## SECTION 5
## MANAGEMENT

5.1     Management by Manager; Voting; Procedure.

(a)     Subject to the requirements of Section 5.2 hereof, all powers to control and manage the business and affairs of the Company shall be exclusively vested in the Manager, and the Manager may exercise all powers of the Company and do all such lawful acts as are not prohibited by statute, the Certificate or this Agreement and in so doing shall have the right and

15

authority to take all actions which the Manager deems necessary, useful or appropriate for the management and conduct of the Company's business, including exercising the following specific rights and powers:

(i)     Conduct its business, carry on its operations and have and exercise the powers granted by the Act in any state, territory, district or possession of the United States, or in any foreign country;

(ii)    Acquire by purchase, lease or otherwise any personal property and fixtures relating to the Project, or the purchase of any real property if such purchase is necessary (as reasonably determined by the Manager) to clear title to the Company's real property;

(iii)   Operate, maintain, finance, improve, construct, own, grant operations with respect to, sell, convey, assign, mortgage, and lease any real estate and any personal property;

(iv)    As set forth in Section 9 hereof, execute any and all agreements, contracts, documents, certifications, and instruments, including executing amendments to this Agreement and the Certificate in accordance with the terms of this Agreement, both as Manager and, if required, as attorney-in-fact for the Members pursuant to any power of attorney granted by the Members to the Manager;

(v)     Borrow money, issue evidences of indebtedness and guaranty the obligations of others, and secure the same by mortgage, pledge, or other lien on any Company assets, and enter into, execute, deliver and perform the Forbearance Agreement;

(vi)    Execute any deed, lease, mortgage, deed of trust, mortgage note, promissory note, bill of sale, contract, or other instrument purporting to convey or encumber any or all of the Company assets, or any amendment thereof;

(vii)   Prepay in whole or in part, refinance, recast, increase, modify, or extend any liabilities affecting the assets of the Company and in connection therewith execute any extensions or renewals of encumbrances on any or all of such assets;

(viii)  Care for and distribute funds to the Members by way of cash income, return of capital, or otherwise, all in accordance with the provisions of this Agreement, and perform all matters in furtherance of the objectives of the Company or this Agreement;

(ix)    Contract on behalf of the Company for the employment and services or employees and/or independent contractors, such as lawyers and accountants, and delegate to such Persons the duty to manage or supervise any of the assets or operations of the Company;

(x)     Engage in any kind of activity and perform and carry out contracts of any kind (including contracts of insurance covering risks to Company assets and

16

to indemnify the Manager) as may be lawfully carried on or performed by a limited liability company under the laws of each state in which the Company is then formed or qualified except as the same may be prohibited under the Act, the Certificate, or this Agreement;

(xi)    Take, or refrain from taking, all actions, not expressly proscribed or limited by this Agreement;

(xii)    Institute, prosecute, defend, settle, compromise, and dismiss lawsuits or other judicial or administrative proceedings brought on or in behalf of, or against, the Company, or the Manager in connection with activities arising out of, connected with, or incidental to this Agreement, and to engage counsel or others in connection therewith;

(xiii)    Purchase, take, receive, subscribe for or otherwise acquire, own, hold, vote, use, employ, sell, mortgage, lend, pledge, or otherwise dispose of, and otherwise use and deal in and with, shares or other interests in or obligations of domestic or foreign corporations, associations, general or limited companies, other limited liability companies, or individuals or direct or indirect obligations of the United States or of any government, state, territory, government district or municipality or of any instrumentality of any of them; and

(xiv)    Determine whether to offer units in the Project for rent or for sale; and

(xv)    Indemnify the Manager, and make any other indemnification that is authorized by this Agreement in accordance with the Act.

(b)    The Manager may authorize any Person or Persons to act for it by proxy on all matters in which a Manager is entitled to participate, including waiving notice of any meeting, or voting or participating at a meeting.  Every proxy must be signed by the Manager or its attorney-in-fact.  No proxy shall be valid after the expiration of eleven (11) months from the date thereof unless otherwise provided in the proxy.  Every proxy shall be revocable at the pleasure of the Manager.

(c)    The Class A Member shall have the sole authority to remove the Manager, for any reason or no reason, in its complete discretion.  In the event of the resignation or removal of the Manager, the Class A Member shall have the sole authority to elect a substitute or replacement Manager.

5.2    (a) Except as provided in Section 5.2(d) hereof, the Manager has the power to bind the Company without obtaining the consent of any Member or holding a meeting with the Members.  Any written resolution signed by the Manager shall be binding on the Company.

(b)    The Manager shall use commercially reasonable efforts to provide notice (which may be by telephone or by email) to the Operating Member prior to taking any of the following actions (the "Major Decisions"):

17

(i)     Causing the Company to provide warranty or other bonds with respect to the construction of the Project or the imposition of a condominium regime with respect to all or part of the Project;

(ii)     Any change order with respect to the construction of the Project, but only if the proposed change exceeds $75,000;

(iii)     Increasing or decreasing the proposed gross sales price of any unit in the Project by more than $75,000 over the amount set forth in Exhibit B attached hereto with respect to such unit,

(iv)     Making any material changes in the contractual relationships between the Company and its general contractor, architect, and civil engineer; and

(v)     Making any material modifications to the loan documents with respect to the mortgage loan from Monument Bank.

(c)     The Manager will shall use commercially reasonable efforts to consult with the Operating Member with respect to any of the matters listed in (b)(i)-(v) above, and (except as provided herein), with respect to such matters, obtain the Operating Member's consent (and which consent shall not be unreasonably withheld, delayed or conditioned, and shall be deemed approved if not rejected in writing within two (2) business days of Manager's request for such consent, which request may only be made following three (3) business days' notice of a meeting or conference call to address the request). If the Manager determines in its sole discretion that the Manager's proposed action is beneficial to the Company, the Manager is hereby authorized to take such action regardless of whether the Manager has consulted in advance with the Operating Member with respect to the proposed action.

(d)     Except as provided in this Section 5.2(d), no sale or refinance of the Project (or any substantial portion thereof, but not including sales of condominium units) may occur without the express written consent of Operating Member, which consent shall not be unreasonably withheld, delayed or conditioned.  In order to assure the same, Manager shall provide Operating Member not less than two (2) business days' notice of any such proposed sale or refinance which request may only be made following three (3) business days' notice of a meeting or conference call to address the requested sale or refinance.

(i)     If after the Project is substantially complete, the Manger delivers a written notice (the "ROFO Notice") offering to sell the Project to the Class B Members for the purchase price set forth in the ROFO Notice (the "Offer") the Class B Members, or any of them, shall have the right to accept the Offer if notice of such acceptance is delivered to the Manager within twenty (20) days of receipt of the ROFO Notice, together with a nonrefundable deposit (which will be credited against said purchase price at Closing) in an amount equal to ten percent (10%) of the purchase price set forth in the ROFO Notice. If notice of acceptance and the deposit is not received within such twenty (20) day period, then notwithstanding anything in this Section 5.2 to the contrary, the Manager shall have the right to sell the Project to a third party for an amount equal to or greater than the purchase price (all

18

cash, due at Closing) set forth in the ROFO Notice, without first obtaining the Operating Member's consent to such sale; provided, however, that if the sale to a third party does not occur within six (6) months of the end of the aforementioned twenty (20) day period, the Manager must provide another ROFO Notice to the Class B Members before it can sell the Project without the Operating Member's consent.

(ii) If the Class B Member accepts the Offer, closing will occur on a date set by the purchaser, but not more than sixty (60) days from the date of the Class B Member's acceptance of the Offer. Such sale shall be "as-is, where-is", with no representations or warranties from the Company. The parties will enter into a purchase and sale agreement pursuant to which taxes, utilities and the like will be prorated in accordance with typical proration provisions for sales of commercial real estate in the District of Columbia; the purchaser shall be responsible for the cost of obtaining title insurance and endorsements, and the cost of a survey, if needed; and the parties will split any D.C. transfer and recordation taxes. The Company will deliver a special warranty deed to the Project at Closing, and shall clear all monetary liens encumbering the Project.

(iii) Notwithstanding anything in this Section 5.2 to the contrary, the Manager shall have the right to refinance the Project without the consent of the Operating Member if (1) the principal amount of the new loan (which may also be an increase in the existing loan with Monument Bank) is at least as large as the then principal balance of the existing loan at the time of refinance and (2) the Class B Members are released (on a going-forward basis) from their existing guarantees and are not required to provide any new guarantees to the lender.

5.3    Reimbursements.  The Company shall reimburse the Manager for all expenses incurred and paid by it in connection with the Project. Such reimbursement shall be treated as expenses of the Company and shall not be deemed to constitute distributions to the Manager or any Member of profit, loss or capital of the Company.

5.4    Indemnification.

(a) The Company, its receiver, or its trustee (in the case of its receiver or trustee, to the extent of the Company's property) shall indemnify, save harmless, and pay all judgments and claims against the Manager relating to any liability or damage incurred by reason of any act performed or omitted to be performed by the Manager in connection with the Company's business, including all attorneys' fees incurred by the Manager in connection with the defense of any action based on any such act or omission, which attorneys' fees may be paid as incurred.

(b) Unless otherwise provided in Section 5.4(c) hereof, in the event of any action by a Member against the Manager, including a Company derivative suit, the Company shall indemnify, save harmless, and pay all expenses of the Manager, including reasonable attorneys' fees incurred in the defense of such action.

19

(c)    Notwithstanding the provisions of Sections 5.4(a) and (b) above, such Sections shall be enforced only to the maximum extent permitted by law and the Manager shall not be indemnified from any liability for fraud, bad faith, willful misconduct or gross negligence; and any indemnification under such Sections shall be provided solely out of and to the extent of Company assets only (including insurance proceeds), and no Member shall have any personal liability on account thereof.

5.5    Compensation; Expenses; Loans.

(a)    No Compensation.  Except as otherwise provided in this Section 5, no Member, Manager, or Officer shall receive any salary, fee, or draw for services rendered to or on behalf of the Company, nor shall any Member be reimbursed for any expense incurred by such Member on behalf of the Company.

(b)    Loans.  Any Member or Affiliate of a Member may, with the consent of the Manager, lend or advance money to the Company.  If any Member or Affiliate shall make any loan or loans to the Company or advance money on its behalf, the amount of any such loan or advance shall not be treated as a contribution to the capital of the Company but shall be a debt due from the Company.  The amount of any such loan or advance by a lending Member or Affiliate of a Member shall be repayable out of the Company's cash and the rate of interest shall be determined by the Manager taking into consideration, without limitation, prevailing interest rates and the terms and conditions of such Loan, including the rate of interest, shall be no less favorable to the Company than if the lender had been an independent third party. Any such loan from a Member shall be fully subordinated to the lien of the then-current secured lender, in such manner as the secured lender shall request.  If the Manager determines that Member loans are needed, the Manager shall send each Member a written notice (the "Loan Notice") stating the amount of loan needed and the date due, which date shall be not less than 7 days from the date of the notice.  The Members will make such loans to the Company based on their respective Percentage Interests; but if any Member declines to make a loan in that amount by giving notice to the Members and the Manger within seven (7) days of receipt of the Loan Notice, the other Members may offer to make additional loans to cover the shortfall (based on their respective Percentage Interests).  If all of the Class B Members decline to lend their full share of the requested loan amount and the Class A Member provides all of the requested funding, the amount provided by the Class A Member shall not be treated as a loan, but as a Capital Contribution; and if the Class A Member declines to lend its full share of the requested loan amount and the Class B Members provide all of the requested funding, the amount provided by the Class B Members shall not be treated as a loan, but as a Capital Contribution.  Interest shall accrue on Member loans made pursuant to this Section 5.5(b) at the rate of twelve percent (12%) per annum, cumulative and compounded annually (the "Member Loan Interest Amount").

5.6    Officers.  (a) The Officers of the Company may be designated by the Manger.  If no Officers have been designated by the Manager then the power to take all actions on behalf of the Company, including the execution of all documents on behalf of the Company, shall be vested solely in the Manager.  The Manager may choose to designate a President, Treasurer, Secretary, and one or more Vice Presidents, Assistant Secretaries, Assistant Treasurers and such other offices as may be designated in writing from time to time.  Any number of offices may be

20

held by the same person.  The Officers shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Manager. The Officers of the Company shall hold office until their successors are chosen and qualified. Any Officer may be removed at any time, with or without cause, by the Manager.  Any vacancy occurring in any office of the Company shall be filled by the Manager.  The initial Officers of the Company designated by the Manager, if any, are listed on Exhibit C hereto.  The Officers shall have the duties and responsibilities set forth in any written document which appoints such officer.

(b)    Officers as Agents.  The Officers, to the extent of their powers set forth in this Agreement or otherwise vested in them by action of the Manager not inconsistent with this Agreement, are agents of the Company for the purpose of the Company's business and, subject to the provisions of this Agreement, the actions of the Officers taken in accordance with such powers shall bind the Company.

5.7    Operating Member.  Greg Auger III is hereby appointed the "Operating Member" for the Class B Members.  In such capacity, he shall have the rights set forth in Sections 5.2(b) and 9.1(b) hereof.  In addition to the rights set forth in Sections 5.2(b) and 9.1(b), the Operating Member will shall have the right to enter upon the Project (subject to compliance with all safety regulations) and shall be entitled to make any such inspections or inquiries as in the exercise of the Operating Member's business judgment may be necessary for the advancement and completion of the Project, but he shall not have any right to direct the actions of the Manager or the Company's contractors, subcontractors or other agents.  The Manager will endeavor to keep the Operating Member reasonably informed as to the progress of the Project and shall be generally available to respond to the Operating Member's reasonable requests for information.

SECTION 6
ROLE OF MEMBERS

6.1    Limited Role of the Members.  Except for (a) the right of the Class A Member to remove and replace the Manager, and to appoint a replacement registered agent or change of address of the registered office, and (b) the approval rights of the Operating Member set forth in Section 5.2(b) hereof, no Member has any right to vote on, or approve, any matter relating to the Company, or to engage in the management or control of the Company, or the Company's business or the Project, or to speak for, make representations about or otherwise bind the Company.

6.2    Withdrawal/Resignation.  Except as otherwise provided in Sections 4 and 12 hereof, no Member shall demand or receive a return on or of its Capital Contributions or withdraw from the Company without the consent of the Manager.  Except as otherwise provided in the Act or this Agreement, upon resignation, any resigning member is entitled to receive only the distribution to which he is entitled under this Agreement, which shall be deemed to be equal to the fair value of his or its Membership Interest in the Company as of the date of resignation. Under circumstances requiring a return of any Capital Contributions, no Member has the right to receive property from the Company other than cash except as may be specifically provided herein.

21

6.3    <u>Member's Liability</u>.  No Member shall be liable under a judgment, decree or order of a court, or in any other manner for the debts or any other obligations or liabilities of the Company.  A Member shall be liable only to make its Capital Contributions and shall not be required to restore a deficit balance in its Capital Account or to lend any funds to the Company or, after its Capital Contributions have been made, to make any additional contributions, assessments or payments to the Company, other than as may be required by law.

6.4    <u>Partition</u>.  While the Company remains in effect or is continued, each Member agrees and waives its rights to have any property of the Company partitioned, or to file a complaint or to institute any suit, action or proceeding at law or in equity to have any property of the Company partitioned, and each Member, on behalf of itself, its successors and its assigns hereby waives any such right.

6.5    <u>Confidentiality</u>.  Except as contemplated hereby, permitted by the Manager or required by a court of competent authority, each Member shall keep confidential and shall not disclose to others who are not Members and shall use its reasonable efforts to prevent its Affiliates and any of its, or its Affiliates' present or former employees, agents, and representatives from disclosing to others without the prior written consent of the Manager any information which (i) pertains to this Agreement, any negotiations pertaining thereto, any of the transactions contemplated hereby, or the business of the Company, or (ii) pertains to confidential or proprietary information of the Manager or any Member or the Company, or which the Manager or any Member has labeled in writing as confidential or proprietary; provided that the Manager or any Member may disclose to its and its Affiliates' employees, agents, and representatives (including legal counsel and accountants) any information made available to the Manager or such Member.  The term "confidential information" is used in this Section 6.5 to describe information which is confidential, non-public or proprietary in nature, was provided to the Manger or a Member or its representatives by the Company, the Manager, any other Member, or such Persons' agents, representatives and employees, and relates either directly, or indirectly to the Company or the Company's business.  Information which (i) is available, or becomes available, to the public through no fault or action by the Manager or any Member, or such Person's agents, representatives or employees or (ii) becomes available on non-confidential basis from any source other than the Company, the Manager or any Member, or such Persons' agents, representatives or employees and such source is not prohibited from disclosing such information, shall not be deemed confidential information.

6.6    <u>Transactions Between a Member and the Company</u>.  Except as otherwise provided by applicable law, any Member may, but shall not be obligated to, lend money (as provided in Section 5.5(b) hereof) to the Company, act as surety for the Company and transact other business with the Company and has the same rights and obligations when transacting business with the Company as a person or entity who is not a Member.  A Member, any Affiliate thereof or an employee, stockholder, agent, director or officer of a Member or any Affiliate thereof, may also be an employee or be retained as an agent of the Company.

6.7    <u>Other Instruments</u>.  Each Member hereby agrees to execute and deliver to the Company within five (5) days after receipt of a written request therefor, such other and further documents and instruments, statements of interest and holdings, designations, powers of attorney

and other instruments and to take such other action as may reasonably be necessary, useful or appropriate to comply with any laws, rules or regulations as may be necessary to enable the Company to fulfill its responsibilities under this Agreement.

## SECTION 7
## ACCOUNTING, BOOKS AND RECORDS

7.1     <u>Maintenance of Books and Records</u>.  At all times, the Manager shall maintain or cause to be maintained true and proper books, records, reports and accounts in which shall be entered fully and accurately all transactions of the Company.

7.2     <u>Inspection</u>.  All books, records, reports, and accounts shall be open to inspection by any Member or his duly authorized representative, upon five (5) days written notice, at such Member's cost and expense.

7.3     <u>Accounting</u>.  The Company's books shall be kept on a cash, accrual or other basis at the direction of the Manager.

7.4     <u>Annual Reports</u>.  The books shall be closed and balanced at the end of each Fiscal Year and there shall be delivered to each Member, within ninety (90) days of the end of each Fiscal Year, a balance sheet, profit and loss statement, a statement showing the accounts of each Member, and each Member's share of profits and losses of the Company for each year reportable for state and federal tax purposes.

7.5     <u>Bank Accounts</u>.   The Manager shall open and maintain one or more bank accounts in the name of the Company.  All of the funds of the Company shall be deposited in this account(s).  The funds in said account(s) will be used solely for the business of the Company and all withdrawals therefrom to be made only on checks signed by the Manager or such other person or persons as the Manager may from time to time designate.  No Person other than the officers of the Manager shall have any signature rights with respect to the Company's bank or other accounts.

## SECTION 8
## TAX MATTERS

8.1     <u>Elections; Tax Matters Member</u>.  The Class A Member shall make any and all elections for federal, state, local, and foreign tax purposes including, without limitation, any election, if permitted by applicable law:  (i) to adjust the basis of Property pursuant to Code Sections 754, 734(b) and 743(b), or comparable provisions of state, local or foreign law, in connection with Transfers of Membership Interests and Company distributions; (ii)  to extend the statute of limitations for assessment of tax deficiencies against the Members with respect to adjustments to the Company's federal, state, local or foreign tax returns; and (iii) to the extent provided in Code Sections 6221 through 6231 and similar provisions of federal, state, local, or foreign law, to represent the Company and the Members before taxing authorities or courts of competent jurisdiction in tax matters affecting the Company or the Members in their capacities as Members, and to file any tax returns and execute any agreements or other documents relating to or affecting such tax matters, including agreements or other documents that bind the Members

23

with respect to such tax matters or otherwise affect the rights of the Company and the Members. The Class A Member is specifically authorized to act as the "Tax Matters Member" under the Code and in any similar capacity under state or local law.

8.2    <u>Tax Information</u>.  Necessary tax information shall be delivered to each Member as soon as practicable after the end of each Fiscal Year of the Company.

SECTION 9<br>AMENDMENTS

9.1    <u>Amendments</u>.

(a)    Amendments to this Agreement may be proposed by the Manager, and shall be adopted and be effective as an amendment hereto if approved by the Manager.

(b)    Notwithstanding Section 9.1(a) hereof, this Agreement shall not be amended without the consent of the Operating Member, which consent shall not be unreasonably delayed, withheld or conditioned, and which consent shall only be required if such amendment would (i) modify the limited liability of a Class B Member, or (ii) alter the interest of a Class B Member in Profits, Losses, other items, or any Company distributions.

SECTION 10<br>TRANSFERS

10.1    <u>Restrictions on Transfers</u>.  Except as otherwise permitted by this Agreement, no Member shall Transfer all or any portion of its Membership Interests.  In the event that any Member pledges or otherwise encumbers all or any part of its Membership Interests as security for the payment of a debt, any such pledge or hypothecation shall be made pursuant to a pledge or hypothecation agreement that requires the pledgee or secured party to be bound by all of the terms and conditions of this Section 10.

10.2    <u>Permitted Transfers</u>.  Subject to the conditions and restrictions set forth in Section 10.4 hereof, a Member may at any time Transfer all or any portion of its Membership Interest to (a) any other Member, (b) one or more of the transferor's children, grandchildren or great-grandchildren (including in each case by way of adoption) of the transferring Member (each such class of transferee being a "family member"), and/or a trust for the benefit of such Member or any family member of such Member (and for purposes of this Section 10.2(a), the family members of the grantor of a trust that are the also beneficiar(ies) of a trust that is a Member shall also be deemed to be a "Member"), (c) the transferor's administrator or trustee to whom such Membership Interest is transferred involuntarily by operation of law, (d) any purchaser approved by the Manager or (e) a transferee in accordance with Section 10.3 hereof (any such Transfer under (a) – (e) being referred to in this Agreement as a "Permitted Transfer").

10.3    <u>Right of First Offer</u>.  If any Member or transferee or assignee of any Member (referred to in this paragraph as Seller) desires to sell his interest in the Company, he shall give each of the other Members ten (10) days' notice of election to sell (option period), and the other

24

Members shall then have the option to purchase the Seller's interest at the price and on the terms stated in the notice, subject to the following conditions:

(a)    If the Seller's entire interest is not purchased by the other Members, the Seller may sell or transfer it or its remaining part to any person, whether or not a party to this agreement, at not less than the price and on the same terms stated in the notice of election to sell. The transferee of the Seller's interest shall be a substituted Member and shall have the same right to receive the transferring Member's share of distribution Profits and Losses.

(b)    If a Seller is unable to sell its interest to any person at the same price and terms as offered, the Seller shall, before any attempt to sell at a lower price or on more favorable terms, or after four (4) months from the date that the notice described in Section 10.3(a) hereof is given, give the other Members a new notice of election to sell in accordance with the requirements stated above, and the procedure for purchase and sale shall again be followed.

10.4    Conditions to Permitted Transfers. A Transfer shall not be treated as a Permitted Transfer under Section 10.2 hereof unless and until the following conditions are satisfied:

(a)    Except in the case of a Transfer involuntarily by operation of law, the transferor and transferee shall execute and deliver to the Company (i) such documents and instruments of conveyance as may be necessary or appropriate in the opinion of counsel to the Company to effect such Transfer, and (ii) such opinions or information as will demonstrate to the satisfaction of the Manager that the Transfer will not result in any materially adverse tax or other consequence to the Company or any non-transferor Member. In the case of a Transfer of Membership Interests involuntarily by operation of law, the Transfer shall be confirmed by presentation to the Company of evidence of such Transfer, in form and substance satisfactory to counsel to the Company and unless required by the Act or approved by the Manager, the transferee shall have no right to vote or to object to any amendment of this Agreement. In all cases, the Company shall be reimbursed by the transferor and/or transferee for all costs and expenses that it reasonably incurs in connection with such Transfer.

(b)    The transferor and transferee shall furnish the Company with the transferee's taxpayer identification number, sufficient information to determine the transferee's initial tax basis in the Membership Interests transferred, and any other information reasonably necessary to permit the Company to file all required federal and state tax returns and other legally required information statements or returns. Without limiting the generality of the foregoing, the Company shall not be required to make any distribution otherwise provided for in this Agreement with respect to any transferred Membership Interests until it has received such information.

10.5    Prohibited Transfers. Any purported Transfer of Membership Interests that is not a Permitted Transfer shall be null and void and of no force or effect whatever; provided that, if the Company is required to recognize a Transfer that is not a Permitted Transfer, the Membership Interests Transferred shall be strictly limited to the transferor's rights to allocations and distributions as provided by this Agreement with respect to the transferred Membership Interests, which allocations and distributions may be applied (without limiting any other legal or

25

equitable rights of the Company) to satisfy any debts, obligations, or liabilities for damages that the transferor or transferee of such Interest may have to the Company.

In the case of a Transfer or attempted Transfer of Membership Interests that is not a Permitted Transfer, the parties engaging or attempting to engage in such Transfer shall be liable to indemnify and hold harmless the Company and the other Members from all cost, liability, and damage that any of such indemnified Members may incur (including, without limitation, incremental tax liabilities, lawyers' fees and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby.

10.6    <u>Rights of Unadmitted Assignees</u>.  A Person who acquires Membership Interests but who is not admitted as a substituted Member pursuant to Section 10.7 hereof shall be entitled only to allocations and distributions with respect to such Membership Interests in accordance with this Agreement, and shall have no right to any information or accounting of the affairs of the Company, shall not be entitled to inspect the books or records of the Company, and shall not have any of the rights of a Member under the Act or this Agreement.

10.7    <u>Admission of Substituted Members</u>.  Subject to the other provisions of this Section 10, a transferee of Membership Interests may be admitted to the Company as a substituted Member only upon satisfaction of the conditions set forth in this Section 10.7:

(a)    Either (i) the Manager consents to such admission, which consent may be given or withheld in the sole and absolute discretion of the Manager; or (ii) the Membership Interest with respect to which the transferee is being admitted was acquired by means of a Permitted Transfer;

(b)    The transferee of the Membership Interest (other than, with respect to clauses (i) and (ii) below, a transferee that was a Member prior to the Transfer) shall, by written instrument in form and substance reasonably satisfactory to the Manager (i) accept and adopt the terms and provisions of this Agreement, including this Section 10, and (ii) assume the obligations of the transferor Member under this Agreement with respect to the transferred Membership Interest.  The transferor Member shall be released from all such assumed obligations except (x) those obligations or liabilities of the transferor Member arising out of a breach of this Agreement on or prior to the transfer, and (y) those obligations or liabilities of the transferor Member based on events occurring, arising or maturing prior to the date of Transfer;

(c)    The transferee pays or reimburses the Company for all reasonable legal, filing, and publication costs that the Company incurs in connection with the admission of the transferee as a Member with respect to the Transferred Membership Interests; and

(d)    Except in the case of a Transfer involuntarily by operation of law, the transferee (other than a transferee that was a Member prior to the Transfer) shall deliver to the Company evidence of the authority of such Person to become a Member and to be bound by all of the terms and conditions of this Agreement, and the transferee and transferor shall each execute and deliver such other instruments as the Manager reasonably deems necessary or appropriate to effect, and as a condition to, such Transfer, including amendments to the

26

Certificate or any other instrument filed with the District of Columbia or any other state or governmental authority.

10.8    Representations Regarding Transfers; Legend.    Each Member hereby represents and warrants to the Company and the Members that such Member's acquisition of Membership Interests hereunder is made as principal for such Member's own account and not for resale or distribution of such Membership Interests.    Each Member further hereby agrees that the following legend may be placed upon any counterpart of this Agreement, the Certificate, or any other document or instrument evidencing ownership of Membership Interests:

The Membership Interests represented by this document have not been registered under any securities laws and the transferability of such Membership Interests is restricted.    Such Membership Interests may not be sold, assigned, or transferred, nor will any assignee, vendee, transferee, or endorsee thereof be recognized as having acquired any such Membership Interests by the issuer for any purposes, unless (1) a registration statement under the Securities Act of 1933, as amended, with respect to such Membership Interests shall then be in effect and such transfer has been qualified under all applicable state securities laws, or (2) the availability of an exemption from such registration and qualification shall be established to the satisfaction of counsel to the Company. The Membership Interests represented by this document are subject to further restriction as to their sale, transfer, hypothecation, or assignment as set forth in this Operating Agreement and agreed to by each Member.

SECTION 11
POWER OF ATTORNEY

11.1    Manager as Attorney-In-Fact.    Each Member hereby makes, constitutes, and appoints the Manager, with full power of substitution and resubstitution, its true and lawful attorney-in-fact for it and in its name, place, and stead and for its use and benefit, to sign, execute, certify, acknowledge, swear to, file, publish and record (i) all certificates of formation, amended name or similar certificates, and other certificates and instruments (including counterparts of this Agreement) which the Manager may deem necessary to be filed by the Company under the laws of the District of Columbia or any other jurisdiction in which the Company is doing or intends to do business; (ii) any and all amendments, restatements or changes to this Agreement and the instruments described in clause (i), as now or hereafter amended, which the Manager may deem necessary to effect a change or modification of the Company in accordance with the terms of this Agreement, including, without limitation, amendments, restatements or changes to reflect (A) any amendments adopted by the Manager in accordance with the terms of this Agreement and (B) the admission of any substituted Member; (iii) all certificates of cancellation and other instruments which are necessary or appropriate to effect the dissolution and termination of the Company pursuant to the terms of this Agreement and (iv) any other instrument which is now or may hereafter be required by law to be filed on behalf of the Company or is necessary to carry out fully the provisions of this Agreement in accordance with its terms.    Each Member authorizes such attorney-in-fact to take any further action which such attorney-in-fact shall consider necessary in connection with any of the foregoing, hereby giving each such attorney-in-fact full power and authority to do and perform each and every act or thing whatsoever requisite to be done in connection with the foregoing as

27

fully as such Member might or could do personally, and hereby ratify and confirm all that any such attorney-in-fact shall lawfully do, or cause to be done, by virtue thereof or hereof.

11.2    <u>Nature of Special Power</u>.  The power of attorney granted to the Manager pursuant to this Section 11:

(a)    Is a special power of attorney coupled with an interest and is irrevocable;

(b)    May be exercised by any such attorney-in-fact by listing the Members executing any agreement, certificate, instrument, or other document with the single signature of any such attorney-in-fact acting as attorney-in-fact for such Members; and

(c)    Shall survive and not be affected by the subsequent bankruptcy, insolvency, dissolution, or cessation of existence of a Member and shall survive the delivery of an assignment by a Member of the whole or a portion of its interest in the Company (except that where the assignment is of such Member's entire interest in the Company and the assignee, with the consent of the Manager, is admitted as a substituted Member, the power of attorney shall survive the delivery of such assignment for the sole purpose of enabling any such attorney-in-fact to effect such substitution) and shall extend to such Member's or assignee's successors and assigns.

SECTION 12
DISSOLUTION AND WINDING UP

12.1    <u>Dissolution</u>.  The Company shall dissolve and shall commence winding up and liquidating upon the first to occur of any of the following (each a "Dissolution Event"):

(a)    The determination of the Manager to dissolve, wind up, and liquidate the Company; or

(b)    The occurrence of any event under the Act which results in the dissolution of the Company.

12.2    <u>Winding Up</u>.    Upon the occurrence of (i) a Dissolution Event or (ii) the determination by a court of competent jurisdiction that the Company has dissolved prior to the occurrence of a Dissolution Event, the Company shall continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and Members, and neither the Manager nor any Member shall take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Company's business and affairs, provided that all covenants contained in this Agreement and obligations provided for in this Agreement shall continue to be fully binding upon the Members until such time as the Company's property has been distributed pursuant to this Section 12.2 and the Certificate has been canceled pursuant to the Act.    The Manager shall be responsible for overseeing the winding up and dissolution of the Company, which winding up and dissolution shall be completed as soon as practicable following the occurrence of the Dissolution Event.  The Manager shall take full account of the Company's liabilities and Property and shall cause the Property or the proceeds from the sale thereof (as determined pursuant to Section 12.3 hereof), to

28

the extent sufficient therefor, to be applied and distributed, to the maximum extent permitted by law, in the following order:

(a)    First, to creditors (including the Manager or any Members who are creditors, to the extent otherwise permitted by law, provided however, that any third party debts owed by the Company are satisfied first) in satisfaction of all of the Company's debts and other liabilities (whether by payment or the making of reasonable provision for payment thereof), other than liabilities for which reasonable provision for payment has been made and liabilities for distribution to members; and

(b)    The balance, if any, to the Members in accordance with Section 4.1 hereof.

No Member shall receive additional compensation for any services performed pursuant to this Section 12.

12.3    Winding Up Procedures.  In connection with the winding up of the Company's business and distribution of its assets, the Manager may:

(a)    Distribute all or a portion of the assets to a trust established for the benefit of the Members for the purposes of liquidating Company assets, collecting amounts owed to the Company, and paying any contingent or unforeseen liabilities or obligations of the Company. The assets of any such trust shall be distributed to the Members from time to time, in the same proportions as the amount distributed to such trust by the Company would otherwise have been distributed to the Members pursuant to Section 12.2 hereof; or

(b)    Withhold from any distribution under this Section 12 to provide a reasonable reserve for Company liabilities (contingent or otherwise) and to reflect the unrealized portion of any installment obligations owed to the Company, provided that such withheld amounts shall be distributed to the Members as soon as practicable.

12.4    Deemed Distribution and Recontribution.  Notwithstanding any other provision of this Section 12, in the event the Company is liquidated within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g) but no Dissolution Event has occurred, the Property shall not be liquidated, the Company's debts and other liabilities shall not be paid or discharged, and the Company's affairs shall not be wound up.  Instead, solely for federal income tax purposes, the Company shall be deemed to have distributed the Property in-kind to the Members, who shall be deemed to have taken subject to all debts of the Company and other liabilities all in accordance with their respective Capital Accounts.  Immediately thereafter, the Members shall be deemed to have recontributed the Property in-kind to the Company, which shall be deemed to have taken subject to all such liabilities.

12.5    Rights of Members.  Except as otherwise provided in this Agreement, each Member shall look solely to the Property of the Company for any distributions hereunder and has no right or power to demand or receive Property other than cash from the Company.  If the assets of the Company remaining after payment or discharge of the debts or liabilities of the Company

29

are less than any Member's Capital Contribution, such Member shall have no recourse against the Company or any other Member.

      12.6   <u>Winding Up and Certificate of Dissolution</u>.  The winding up of the Company shall be completed when all debts, liabilities and obligations of the Company have been paid and discharged or reasonably adequate provision therefor has been made, and all of the remaining property and assets of the Company have been distributed to the Members.  Upon the completion of winding up of the Company, a certificate of dissolution shall be delivered to the Department for filing.  The certificate of dissolution shall set forth the information required by the Act.

      12.7   <u>Allocations During Period of Liquidation</u>.  During the period commencing on the first day of the Fiscal Year during which a Dissolution Event occurs and ending on the date on which all of the assets of the Company have been distributed to the Members pursuant to Section 12.2 hereof (the "Liquidation Period"), the Members shall continue to share Profits, Losses, gain, loss and other items of Company income, gain, loss or deduction in the manner provided in Appendix A hereof.

      12.8   <u>Character of Liquidating Distributions</u>.  All payments made in liquidation of the interest of a Member in the Company shall be made in exchange for the interest of such Member in Property pursuant to Section 736(b)(1) of the Code, including the interest of such Member in Company goodwill.

SECTION 13
MISCELLANEOUS

      13.1   <u>Notices</u>.  Any notice, payment, demand, or communication required or permitted to be given by any provision of this Agreement shall be in writing and shall be deemed to have been delivered, given, and received for all purposes (i) if delivered personally to or refused by the Person or to an officer of the Person to whom the same is directed, or (ii) when the same is actually received, if sent either by registered or certified mail, or by Federal Express or other overnight delivery service, postage and charges prepaid, or by facsimile, if sent to the address set forth on Exhibit A attached hereto, or to such other address as such Person may from time to time specify by notice to the Members.

      13.2   <u>Binding Effect</u>.  Except as otherwise provided in this Agreement, every covenant, term, and provision of this Agreement shall be binding upon and inure to the benefit of the Manager and the Members and their respective successors, transferees, and assigns.

      13.3   <u>Construction</u>.  Every covenant, term, and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Member.

      13.4   <u>Time</u>.  In computing any period of time pursuant to this Agreement, the day of the act, event or default from which the designated period of time begins to run shall not be included, but the time shall begin to run on the next succeeding day.  The last day of the period so computed shall be included, unless it is a Saturday, Sunday or legal holiday in Washington, D.C., in which event the period shall run until the end of the next day which is not a Saturday, Sunday or legal holiday in Washington, D.C.

30

13.5    Headings.    Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision hereof.

13.6    Severability.    Except as otherwise provided in the succeeding sentence, every provision of this Agreement is intended to be severable, and, if any term or provision of this Agreement is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement. The preceding sentence of this Section 13.6 shall be of no force or effect if the consequence of enforcing the remainder of this Agreement without such illegal or invalid term or provision would be to cause any Member to lose the material benefit of its economic bargain.

13.7    Incorporation by Reference.    Every exhibit, schedule, and other appendix attached to this Agreement and referred to herein is not incorporated in this Agreement by reference unless this Agreement expressly otherwise provides.

13.8    Variation of Terms.    All terms and any variations thereof shall be deemed to refer to masculine, feminine, or neuter, singular or plural, as the identity of the Person or Persons may require.

13.9    Governing Law.    The laws of the District of Columbia shall govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties arising hereunder.

13.10    Waiver of Jury Trial.    Each of the Members irrevocably waives to the extent permitted by law, all rights to trial by jury and all rights to immunity by sovereignty or otherwise in any action, proceeding or counterclaim arising out of or relating to this Agreement.

13.11    Counterpart Execution; Facsimile or Electronic Transmission.    This Agreement may be executed in any number of counterparts with the same effect as if all of the Members had signed the same document. All counterparts shall be construed together and shall constitute one agreement. The delivery of an executed counterpart of this Agreement by facsimile or other electronic transmission shall be deemed to be an original for all purposes of this Agreement.

13.12    Specific Performance.    Each Member agrees with the other Members that the other Members would be irreparably damaged if any of the provisions of this Agreement are not performed in accordance with their specific terms and that monetary damages would not provide an adequate remedy in such event. Accordingly, it is agreed that, in addition to any other remedy to which the nonbreaching Members may be entitled, at law or in equity, the nonbreaching Members shall be entitled to injunctive relief to prevent breaches of the provisions of this Agreement and specifically to enforce the terms and provisions hereof in any action instituted in any court of the United States or any state thereof having subject matter jurisdiction thereof.

[SIGNATURES APPEAR ON THE FOLLOWING PAGE]

31

**IN WITNESS WHEREOF,** the Members and the Manager have executed and delivered this Agreement as of the day and year first above written.

Manager:

TRG Development LLC,
a District of Columbia limited liability company

By: The Rubin Group LLC, a
Virginia limited liability company
Its: Managing Member

By: _____
Name: Andrew Rubin
Title:   Managing Member


Class A Member:

819 Capital LLC,
a District of Columbia limited liability company

By: The Rubin Group LLC, a
Virginia limited liability company
Its: Managing Member

By: _____
Name: Andrew Rubin
Title:   Managing Member

Class B Members:


_____
Gregory U. Auger II, Individually


_____
Gregory Auger, III, Individually


_____
Christos Economakis, Individually

**IN WITNESS WHEREOF,** the Members and the Manager have executed and delivered this Agreement as of the day and year first above written.

Manager:

TRG Development LLC,
a District of Columbia limited liability company

By: The Rubin Group LLC, a
Virginia limited liability company
Its: Managing Member


By: _____
Name:  Andrew Rubin
Title:   Managing Member


Class A Member:

819 Capital LLC,
a District of Columbia limited liability company

By: The Rubin Group LLC, a
Virginia limited liability company
Its: Managing Member

By: _____
Name:  Andrew Rubin
Title:   Managing Member

Class B Members:

_____
Gregory U. Auger II, Individually


_____
Gregory Auger, III, Individually


_____
Christos Economakis, Individually

*Signature Page to Amended and Restated Operating Agreement Of  819 D LLC*

**IN WITNESS WHEREOF,** the Members and the Manager have executed and delivered this Agreement as of the day and year first above written.

Manager:

TRG Development LLC,
a District of Columbia limited liability company

By: The Rubin Group LLC, a
Virginia limited liability company
Its: Managing Member

By: _____
Name: Andrew Rubin
Title:   Managing Member

Class A Member:

819 Capital LLC,
a District of Columbia limited liability company

By: The Rubin Group LLC, a
Virginia limited liability company
Its: Managing Member

By: _____
Name: Andrew Rubin
Title:   Managing Member

Class B Members:

_____
Gregory U. Auger II, Individually

_____
Gregory Auger, III, Individually

_____
Christos Economakis, Individually

*Signature Page to Amended and Restated Operating Agreement Of  819 D LLC*

[Exhibits A and B Omitted]

EXHIBIT C

Officers

President                                    Andrew Rubin

Vice President                               Mimi Tygier